IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ADEMUS AKADEAMEUER SAECHAO,

                 Petitioner,                  OPINION and ORDER

    v.                                      17-cv-370-slc

CHERYL EPLETT, Warden[1],
Oakhill Correctional Institution,

                 Respondent.

---

State inmate Ademus Akadeameuer Saechao has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his state court convictions in Marathon County Circuit Court for one count of armed robbery with threat of force, two counts of armed burglary, two counts of theft as party to a crime and two counts of false imprisonment. Saechao claims that the trial court deprived him of his right to counsel of his choice when it found that his lawyer had a conflict of interest that disqualified him from representing petitioner, in violation of *Wheat v. United States*, 486 U.S. 153 (1988).[2] The state filed an answer to the petition and both parties filed briefs in support of their respective positions.

Having read and considered the pleadings, the briefs and the record of the state court proceedings, I conclude that this case is a genuine wobbler. But for the two layers of deference owed to the State's decision in this situation, Saechao probably would prevail. I find that Saechao ultimately cannot meet his high burden to show that the Wisconsin Court of Appeals unreasonably applied *Wheat* when it affirmed the trial court's decision. Accordingly, I am denying

---

[1] Warden Eplett, Saechao's current custodian, is substituted for Lizzie Tegels.

[2] Saechao's petition also included a claim that the lawyer who ultimately represented him at trial was ineffective, but he has abandoned that claim.

the petition. Reasonable jurists could debate this conclusion, so I will issue a certificate of appealability to petitioner so that he may seek further review from the Court of Appeals for the Seventh Circuit.

BACKGROUND

The following facts are drawn from the Wisconsin Court of Appeals' unpublished opinion in *State v. Saechao*, No. 2014AP2975, 2016 WI App 57, 370 Wis. 2d 786, 882 N.W.2d 870 (Wis. Ct. App. June 28, 2016) (unpublished), and from the record:

## I. Pretrial and Trial Proceedings

In 2011, Ademus Saechao was charged in Marathon County Circuit Court Case No. 11CF792 with one count of armed robbery with threat of force, two counts of armed burglary with a dangerous weapon; two counts of theft of movable property with special facts; and two counts of false imprisonment, all as a party to a crime. The criminal complaint and the incorporated police reports alleged that:

> On August 2, 2011, Saechao, Manuel Alonso-Bermudez[3], and Joseph Rohmeyer carried out a robbery at the victims' residence. Alonso-Bermudez knew one of the victims kept numerous guns at the residence.
>
> Saechao drove Alonso-Bermudez and Rohmeyer in a Chrysler to a location near the victims' residence and dropped them off. Alonso-Bermudez and Rohmeyer proceeded through the woods to the residence, during which time Alonso-Bermudez repeatedly called Saechao to let him know their location. Alonso-Bermudez used a cell phone belonging to Harley Schultz to make those calls.

---

[3] Manuel Alonso-Bermudez was also referred to in the record as having the last name Alonso-Bermudas, Alonso, Bermudez, and Bermudas.

Upon entering the residence, Alonso-Bermudez held the victims at gunpoint while Rohmeyer tied the victims' hands behind their backs with vacuum cleaner cords. Alonso-Bermudez then handed Rohmeyer the gun. Rohmeyer stayed with the victims while Alonso-Bermudez searched the residence and garage for guns. Alonso-Bermudez called Saechao to drive the Chrysler to the residence. They then loaded "a bunch of guns" into the trunk and left.

Saechao retained attorney Jay Kronenwetter to represent him. After Saechao retained Kronenwetter, the state public defender's office—unaware that Kronenwetter was representing Saechao—appointed Kronenwetter to represent Alonso-Bermudez in a case involving the same charges[4], as well as another case involving a robbery of a Hardee's restaurant. Kronenwetter was entered as the attorney of record for Alonso-Bermudez before he was entered as the attorney of record for Saechao.

On November 21, 2011, Saechao appeared for a preliminary hearing before the Hon. Jill Falstad. Kronenwetter appeared as Saechao's attorney, reporting that he was making a special appearance for Saechao, because "the potential for future conflicts with existing clients [was] too great for [him] to continue after this stage in the proceedings." Dkt. 15-10: 5. Kronenwetter said that "from the information provided to me by both of my clients, I do not see a conflict," but that he had been told by the public defender's office and the DA's office that there was one. *Id.* at 7. The court held the preliminary hearing in part, but granted a continuance because one of the victims had not received a subpoena. At the hearing's close, Kronenwetter informed the court that the public defender's office would be evaluating Saechao to determine his eligibility for public defender representation. *Id.* at 33.

---

[4] Although Saechao and Alonso-Bermudez were not charged in the same criminal complaint and were not on the same trial track, no one disputed that they were codefendants charged for the same allegations regarding the August 2011 robbery.

In spite of his remarks, Kronenwetter continued to represent both Saechao and Alonso-Bermudez. In the meantime, Saechao's case had been assigned to the Hon. Michael K. Moran. On December 6, 2011, before Saechao's continued preliminary hearing, Judge Moran held a hearing to address its concerns about the dual representation. Kronenwetter informed the court that although the public defender's office had expressed concern about potential future conflicts, he was satisfied that "no current conflict exists" and that potential future conflicts were "highly unlikely." Dkt. 15-12: 3. Kronenwetter stated that both clients had expressed a strong interest in keeping him as their lawyer but that he did not believe that he could adequately address with his clients all potential future conflicts at that point so as to obtain an informed waiver. *Id*. at 4.

Judge Moran responded by referring to his experience as a public defender for 20 years to note that "it's rarely, if ever, a good idea to represent codefendants in the same case," and that the court would feel much more comfortable if there was a written waiver. *Id*. at 8-9. Although Judge Moran expressed great concern about Kronenwetter's continued representation of codefendants facing the same charges, he did not require Kronenwetter to withdraw from Saechao's case. Judge Moran said he would "let it play out," although he made clear that he would address the matter again should the concern become greater. *Id*. at 5-7.

On January 5, 2012, Kronenwetter withdrew from Alonso-Bermudez's cases, while continuing to represent Saechao. Attorney John Bachman was appointed as Alonzo-Bermudez's new attorney.

Jury trial in Saechao's case was scheduled for April 11, 2012. In early April, the State identified Alonso-Bermudez as a potential witness in Saechao's trial. During an April 3, 2012 motion hearing, the State raised concerns about Kronenwetter's past representation of Alonso-

Bermudez, given that Alonzo-Bermudez might be a witness at Saechao's trial. The State did *not* ask the trial court to remove Kronenwetter but it did ask the court to conduct a colloquy with Alonso-Bermudez and Saechao in accordance with Wisconsin Supreme Court Rule 20:1:9, which provides:

> Duties to former clients. (a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in a writing signed by the client.
>
> * * *
>
> (c) A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:
>
> > (1) use information relating to the representation to the disadvantage of the former client except as these rules would permit or require with respect to a client, or when the information has become generally known; or
> >
> > (2) reveal information relating to the representation except as these rules would permit or require with respect to a client.

Kronenwetter responded that there was no actual conflict and no potential for conflict if he were to have to cross-examine Alonso-Bermudez at Saechao's trial. Dkt. 15-15: 11. Kronenwetter also said that when he had represented Alonso-Bermudez, he did not obtain any confidential information that could be used in Saechao's case. *Id.* The court asked the parties to submit case law on the issue. *Id.* at 14.

The court held another hearing on April 6, 2012, at which the State, Kronenwetter, Saechao, Attorney Bachman, and Alonso-Bermudez appeared. The State had submitted a letter responding to the court's request for case law, but Kronenwetter did not file a response.

Bachman, Alonso-Bermudez's successor counsel, said that his client was willing to sign a written waiver as to any conflicts as to Saechao's case but he would not sign a waiver as to the case involving the Hardee's robbery. Bachman further expressed his concern that if the State called Alonso-Bermudez to testify at Saechao's trial, then "Mr. Kronenwetter would probably try to impeach Mr. Alonso[-Bermudez] with things that he wouldn't otherwise have been privy to." Because of this, opined Bachman, Kronenwetter ought not continue on the case. Even so, Alonso-Bermudez was willing to execute a written waiver of any conflict in the Saechao case. Dkt. 15-15: 9.

The prosecutor said that although she originally thought the potential conflict could be resolved by obtaining waivers from both defendants, she now was of the opinion that the waivers would not be valid unless Kronenwetter revealed confidential information from each client to the other client, which would itself be an ethics violation. *Id*. at 4-6. As the prosecutor saw it, Kronenwetter had an unwaivable, unresolvable conflict. *Id*. at 5-6.

Kronenwetter criticized the request to disqualify him, saying it was likely due to the prosecutor's "lack of trial preparation." *Id*. at 9-10. He repeated that Saechao and Alons-Bermudez did not have adverse interests and that nothing he heard or discovered during his representation of Alonso-Bermudez could harm him in any fashion by his representation of Saechao. *Id*. at 12-13. Kronenwetter said that he had consulted with the State Bar's ethics lawyer multiple times, who confirmed there was no current conflict. *Id*. at 14. Moreover, Kronenwetter had personally conducted an investigation and had interviewed witnesses in Saechao's case, so disqualification could be very harmful to Saechao. *Id*. at 13-14. Kronenwetter said he "[did not] see this potential conflict coming to fruition," adding that Alonso-Bermudez had an adverse interest only "based on late developments from the state." *Id*. He went on to say

that he had a "sneaking suspicion that the state is not prepared for trial and does not wish to honor my client's speedy trial demand." *Id*. at 14.

The trial court disqualified Kronenwetter from representing Saechao. The court explained that its decision was based on Alonso-Bermudez's refusal to provide a complete waiver, the potential that a conflict of interest would arise, and the "significant ethical issues" in the case that could hamper Kronenwetter from zealously defending Saechao. Addressing Kronenwetter, the court said:

> You know how trials go. You are an experienced attorney, Mr. Kronenwetter, and I know how trials go, because I have done trials. In the future there could be significant potentially-adverse positions taken, including plea negotiations, a well as trial strategy. That's where the court's concern is; very much the court's concern.
>
> Halfway through trial, Mr. Saechao, and I am pulling this – he may decide to say that Mr. Bermudez, and I am saying this completely without any relation to it, that Mr. Bermudez is the one who did that, and he didn't, and that could occur the other way. There may be a desire to work out something in this case, or the ability, and it hampers – my potential concern is it hampers your ability to negotiate or to put on defenses or to put on cases without being fettered, and I use the word fettered, by your previous representation of Mr. Bermudez.
>
> This court has – the purpose of this court is to have a fair and effective administration of justice, and this court's concern is that Mr. Saechao and Mr. Bermudez have a fair trial. That's this court's concern; fairness, impartiality, and justice. That's what this court is all about. If some of the parties, or one of the parties, or the attorney for one of the parties, does not have the ability, potentially because of ethical issues or ethical restraints, to do that, then this court has great concern.
>
> It may be more prospective maybe than reflective, so that's where this court's concern is.
>
> Tr. of Mot. Hrg., April 6, 2012, dkt. 15-15: 11-12.

The court also noted that Alonso-Bermudez's lawyer and the prosecutor both took the position that Kronenwetter could not proceed without a complete waiver from Alonso-Bermudez. *Id*. at 16-17. The court adjourned the jury trial and directed Kronenwetter to forward only the discovery obtained from the State to Saechao's successor counsel.

However, on April 9, 2012, Kronenwetter filed a notice of appearance for Saechao. Attached to the notice was a letter from Bachman, who stated that Alonso-Bermudez was now willing to waive in writing any attorney-client conflict he may have with Kronenwetter for *both* of the cases in which Kronenwetter had represented him. At a hearing on April 11, 2012, the court questioned the validity of a waiver from Alonso-Bermudez, who had since decided to fire Bachman. Dkt. 15-16: 5. The court also agreed with the prosecutor that there could be no valid waiver because any waiver would require the disclosure of confidential information between Saechao and Alonso-Bermudez, which would be another ethics violation. It reaffirmed its April 6, 2012 ruling disqualifying Kronenwetter, this time concluding that counsel's continued representation of Saechao presented both an actual conflict and a serious potential for conflict of interest. Dkt. 15-16: 7-8.

Kronenwetter disagreed with the court's assessment that an actual conflict existed, stating:

> Now your Honor is taking the position that co-defendants or seems to be taking the position in this, rules that co-defendants are necessarily materially adverse.
>
> The problem I have there is that typically when we talk about adverse positions in litigation we are talking about taking different positions. We are talking about having different interests because the case they wish to pursue their facts, their law, their arguments are in conflict.
>
> In this circumstance, your Honor, once again understanding my duty of candor and honesty to this tribunal as an attorney I can assure you that absent the sky falling and everything taking a 180

> their positions are not materially adverse. In fact their positions are exceedingly similar. They are on – from both of their perspectives they are on the receiving end of false allegations and they are being blamed for crimes they did not commit by the State.

Dkt. 15-16: 16.

As for potential future conflicts, Kronenwetter said that during the time he represented Alonso-Bermudez, he was "very cautious about undertaking lines of inquiry that would present a problem until I had squared away the representation of both co-defendants." *Id*. at 19.

In response, the court said that it took a strict view of ethical issues and, even though Kronenwetter was "an ethical attorney . . . I don't understand how you can represent two co-defendants in the same case and not have a conflict." *Id*. at 22. The court emphasized that it was not taking the decision "lightly" and had "looked at this from many different perspectives in a way to see if there was a possible way of Mr. Kronenwetter to continue on this case." Ultimately, said the court, it could not see how Kronenwetter could remand on the case "given the Ethics Code and the way it's written." *Id*. at 23.

Successor counsel was appointed to represent Saechao, and the case ultimately proceeded to a two-day jury trial. The State called Rohmeyer and Schultz to testify, both of whom implicated Saechao in the August 2011 robbery and related offenses. Alonso-Bermudez was not called as a witness, and Saechao did not testify or call any witnesses. The jury found Saechao guilty of all seven counts as charged in the complaint, and he was subsequently sentenced to 13 years' initial confinement and ten years' extended supervision.

## II. Postconviction Motion

Saechao filed a motion for postconviction relief, arguing that the trial court should not have removed Kronenwetter, successor counsel was ineffective, and the State failed to disclose that Rohmeyer and Schultz were given favorable plea deals in exchange for their testimony. At a hearing on the motion, Kronenwetter testified that he saw no conflict that would prevent him from representing Saechao after he withdrew from representing Alonso-Bermudez, although he was "mindful of potential conflicts at sentencing." Dkt. 15-20: 19. Kronenwetter explained that, if he had been permitted to continue representing Saechao, then his defense strategy would have been to argue that Saechao's roommate, Xue Lee, had been the person actually involved in the robbery, not Saechao. *Id*. at 33. Kronenwetter said he did not believe Alonso-Bermudez would be testifying against Saechao based on information he had received from Alonso-Bermudez's attorney and from the State. *Id*. at 27.

Saechao called Rohmeyer's lawyer to testify in support of Saechao's claim that Rohmeyer had been given a favorable plea deal in exchange for his testimony. Counsel denied that assertion. She testified that Rohmeyer had made a full confession, including a full statement against Saechao, before he had even been charged, decided that testifying against Saechao and Alonso-Bermudez was his best defense, and had been promised nothing by the State in order to do so. Dkt. 15-20: 7-9.[5]

The trial court affirmed its prior decision to disqualify Kronenwetter. Citing *United States v. Wheat*, 486 U.S. 153 (1987), the judge recognized that "[a] defendant generally has the right to chosen counsel, but the right is not absolute," and that counsel could be disqualified "when

---

[5] Rohmeyer's lawyer was not asked any questions regarding Saechao's challenge to the trial court's disqualification decision.

either an actual conflict or serious potential conflict of interest exists." Tr. of Oral Ruling, Nov. 24, 2014, dkt. 15-21:3. The court further observed that under *Wheat*, "[a] trial court has wide discretion to balance the defendant's right to counsel of choice against the need for fairness . . . and to ensure that criminal trials are conducted within the ethical standards of the profession." *Id.*, dkt. 15-21:6.

Applying this standard to the facts, the court denied Saechao's motion and reaffirmed its prior conclusion that there were "clear, serious potential conflicts, or actual conflicts" warranting Kronenwetter's disqualification. Dkt. 15-21:14. The court reiterated its skepticism about Kronenwetter's assertion that he did not have an actual or potential conflict of interest after having previously represented Alonso-Bermudez in the same case, noting that it had "no doubt" that Kronenwetter had obtained confidential and potentially incriminating information from Alonso-Bermudez during the period of dual representation that could be used against Saechao in Saechao's trial. Dkt. 15-21: 6-7.

The court then articulated six reasons that justified Kronenwetter's disqualification:

> (1) there was no "valid waiver" by Alonso-Bermudez;
>
> (2) Alonso-Bermudez was named as a witness by the state, and if called to testify, Kronenwetter would have had to cross-examine him, potentially implicating privileged client matters;
>
> (3) The case was charged as a conspiracy, so Kronenwetter "could not avoid the possibility at some stage in the trial of implicating Alonso-Bermudez, his former client, as a member of the conspiracy";
>
> (4) Alonso-Bermudez and Saechao were "codefendants; same facts, same parties, same alleged conspiracy, same case," so representation "could require the disclosure of confidential information," and the State could make offers "before, after, or during trial in exchange for their cooperation" that would lead to one defendant testifying against the other;

(5) Kronenwetter functioned as the investigator for the case and thus would have had difficulty impeaching any witnesses that he interviewed, including Alonso-Bermudez; and

(6) The jury instructions mentioned Alonso-Bermudez, so if Kronenwetter were to argue that someone other than Saechao was driving the vehicle, "he would still have to implicate" Alonso-Bermudez.

## III. Decision of the Wisconsin Court of Appeals

Saechao appealed, arguing that the potential conflict of interest relied upon by the court in disqualifying Kronenwetter was "utterly speculative" because it was unlikely that Alonso-Bermudez was going to be used by the State against Saechao, or vice versa, because of Rohmeyer and Schultz.[6] On June 28, 2016, the Wisconsin Court of Appeals issued a per curiam decision rejecting Saechao's claim and affirming his conviction. *State v. Saechao*, No. 2014AP2975-CR, 2016 WL 3510531 (Ct. App. June 28, 2016) (unpublished) (copy available at dkt. 1-2).

The court first recognized that one element of the Sixth Amendment right to counsel is the right to have one's counsel of choice, the erroneous deprivation of which is a structural error. *Id*. ¶ 18 (citing *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006)). It then accurately set out the governing legal standard:

> However, the right is not absolute. *See Wheat v. United States*, 486 U.S. 153, 159, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988). While courts must recognize a presumption in favor of an accused's choice of counsel, *see id.* at 164, a "circuit court may, in its discretion, disqualify counsel of a criminal accused, even over the accused's objection and proffered waiver of the right to conflict-free representation, when an actual or a serious potential for conflict of interest exists," *State v. Miller*, 160 Wis.2d 646, 650, 467 N.W.2d 118 (1991). "An actual conflict or serious potential for conflict of

---

[6] Saechao also pursued his ineffective assistance of counsel claim, but he abandoned his claim that Rohmeyer had been given a favorable plea deal in exchange for his testimony.

> interest imperils the accused's right to adequate representation and
> jeopardizes the integrity of the adversarial trial process and the
> prospect of a fair trial with a just, reliable result." *Id*. at 653, 467
> N.W.2d 118. The evaluation of the facts and circumstances of each
> case are left primarily to the informed judgment of the circuit
> court.   *Wheat*, 486 U.S. at 164. However, in exercising its
> discretion, a circuit court should be alert to the possibility that the
> State may seek to manufacture a conflict and carefully explore this
> issue on the record. *Miller*, 160 Wis.2d at 654, 467 N.W.2d 118.

> *Saechao*, 2016 WI App 57, ¶19.

Reviewing the six grounds cited by the trial court at the post-conviction hearing for disqualifying Kronenwetter, the Wisconsin Court of Appeals found that the court had properly exercised its discretion.  Observing that "[a] circuit court has wide latitude in balancing the right to counsel of choice against the needs of fairness," (citation omitted), the appellate court noted that the circuit court had "fully articulated its concerns on the record and identified the particular conflicts in the case as it saw them." *Id*. ¶ 27.  The court also rejected Saechao's claim that the State had instigated Kronenwetter's disqualification, pointing out that the circuit court had stated that it was acting under its inherent authority when it disqualified Kronenwetter and noted during the postconviction hearing that "every court that presided over this case was concerned about the potential for conflict." *Id*. ¶ 26.

In a footnote, the Wisconsin Court of Appeals addressed Saechao's argument that there was never any serious indication that the State was going to use Alonso–Bermudez against Saechao or use Saechao in the case against Alonso–Bermudez due to Rohmeyer's and Schultz's cooperation, and a conflict never came to fruition because Alonso–Bermudez did not testify. Observing that Saechao's position "relies on the benefit of hindsight," the court wrote:

> Here, the circuit court was confronted with having to decide
> whether Kronenwetter should be disqualified based on an actual
> conflict or serious potential conflict of interest in the "murkier"

pretrial context, during which the "likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict[.]" *See Wheat v. United States*, 486 U.S. 153, 162, 108 S. Ct. 1692, 100 L. Ed.2d 140 (1988). As the State argues, had Rohmeyer decided not to cooperate on the day of trial or had problems arisen during his testimony, Alonso–Bermudez's testimony would have been necessary because Alonso–Bermudez had information about Saechao's involvement known only to him, Saechao, and Rohmeyer.

*State v. Saechao*, 2016 WI App 57, n. 11.

The Wisconsin Supreme Court denied Saechao's petition for review.

Saechao now brings this federal petition for habeas relief, which is available to a state prisoner who can establish that he is in custody in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a). Saechao contends that the state courts' determination that attorney Kronenwetter's prior representation of Alonso-Bermudez presented an actual or potential conflict of interest warranting his disqualification violated his Sixth Amendment right to the counsel of his choice. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006); *Wheat v. United States*, 486 U.S. 153, 159 (1988).

OPINION

## I. Legal Standards

### A. Standard of Review

Saechao's ability to obtain relief from this court is governed by the Antiterrorism and Effective Death Penalty Act of 1996, which commands federal courts to accord significant deference to state court adjudications of federal constitutional claims. Specifically, this court cannot grant Saechao relief unless the state court's adjudication of his constitutional claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United States."
§ 2254(d)(1); *Renico v. Lett*, 559 U.S. 766, 772–73 (2010).[7]   Under this standard, it is not enough for Saechao to show that the Wisconsin courts applied the law incorrectly; rather, he must show that they did so *unreasonably*, which is a "substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 478 (2007); *Williams v. Taylor*, 529 U.S. 362, 410 (2000).   In conducting this review, the federal court must examine the reasons the state court gave for its decision rather than substitute "the federal court's thought as to more supportive reasoning." *Wilson v. Sellers*, ___ U.S. ___, 138 S. Ct. 1188, 1192 (2018).

The standard outlined in § 2254(d)(1) is exacting and "highly deferential," *Burt v. Titlow*, 571 U.S. 12, 18 (2013), demanding that state courts be given "the benefit of the doubt." *Harrington v. Richter*, 562 U.S. 86 (2011).   To prevail, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 131 S. Ct. at 786-87.   Put another way, so long as it is within the "realm of possibility" that fairminded jurists could find the state court decision to be reasonable, the court must deny the petition. *See Woods v. Etherton*, 136 S. Ct. 1149, 1152 (2016).

Explaining the importance of these principles, the Supreme Court has said:

> Adherence to these principles serves important interests of federalism and comity. AEDPA's requirements reflect a presumption that state courts know and follow the law.   When reviewing state criminal convictions on collateral review, federal

---

[7] Federal habeas review is also available if the state court's adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."   28 U.S.C. § 2254(d)(2).   Saechao concedes that his case does not implicate this subsection.   Dkt. 19, at 13.

judges are required to afford state courts due respect by
overturning their decisions only when there could be no reasonable
dispute that they were wrong. Federal habeas review thus exists as
a guard against extreme malfunctions in the state criminal justice
systems, not a substitute for ordinary error correction through
appeal.

*Woods v. Donald*, 575 U.S. 312, 316 (2015) (per curiam) (internal
quotation marks and citations omitted).

**B.** *Wheat v. United States*

The parties agree that Saechao's claim is governed by *Wheat v. United States*, 486 U.S.

153, 159 (1988), in which the Court considered the extent to which "a criminal defendant's right

under the Sixth Amendment to his chosen attorney is qualified by the fact that the attorney has

represented other defendants charged in the same criminal conspiracy." *Id*. A longer-than-usual

exegesis of *Wheat* provides helpful context for this court's analysis of Saechao's claim.

Wheat, along with numerous codefendants, was charged with participating in a drug

distribution conspiracy. Wheat's alleged role was to receive and store shipments of marijuana

at his home, which he then distributed to customers. Other defendants charged in the conspiracy

included Juvenal Gomez-Barajas and Javier Bravo, who were represented in their criminal

proceedings by attorney Eugene Iredale. Iredale had obtained an acquittal for Gomez-Barajas

on drug charges that overlapped with the charges against Wheat. To avoid a second trial on

other charges, however, Gomez-Barajas had offered to plead guilty to tax evasion and illegal

importation of merchandise. At the commencement of Wheat's trial, the district court had not

yet accepted Gomez Barajas's plea. Meanwhile, co-conspirator Bravo had decided to plead guilty

to one count of transporting approximately 2400 pounds of marijuana from Los Angeles to a

residence controlled by Victor Vidal.

At the conclusion of Bravo's guilty plea hearing, Attorney Iredale informed the court that Wheat had contacted him to ask if Iredale would try his case, which was scheduled to begin in about a week. The court promptly scheduled a hearing to address the government's concerns about the potential for a conflict of interest if Iredale represented Wheat. The government had two concerns: First, Wheat likely would be called as a witness in Gomez-Barajas's trial if the pending plea deal fell through, in which case Iredale's representation of Wheat would preclude him from cross-examining Wheat at Gomez-Barajas's trial. Second, the government believed that a portion of the marijuana delivered by Bravo to Vidal's residence was eventually transferred to Wheat, and the government had asked Iredale to make Bravo available as a witness to testify against Wheat in exchange for the government's favorable recommendation at Bravo's sentencing. In the likely event that the government called Bravo to testify, Iredale's dual representation would bar him from cross-examining Bravo in any meaningful way.

In response, Wheat argued that he had the right to counsel of his choosing and that all three co-conspirators were willing to waive their right to conflict-free counsel. In addition, he asserted that the circumstances posited by the government that would create a conflict for Iredale were highly speculative and bore no connection to the true relationship between the co-conspirators. Iredale proffered that if Bravo were called to testify at Wheat's trial, he would say that he did not know Wheat and had no dealings with him. Therefore, it would not be necessary for Iredale to impeach Bravo. Further, in the unlikely event that Gomez–Barajas went to trial on the charges of tax evasion and illegal importation, Wheat's lack of involvement in those alleged crimes made it unlikely that Wheat would be called as a witness. *Wheat*, 486 U.S. at 156–57.

The trial court rejected Wheat's arguments and denied his request for substitution. The court found that Iredale had an irreconcilable conflict of interest that could not be waived. The Court of Appeals for the Ninth Circuit affirmed, finding that the trial court had properly exercised its discretion in balancing Wheat's right to be represented by counsel of his choice and his right to conflict-free representation. *Id*. at 157.

The Supreme Court agreed. Explaining that "courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them," the Court held that "where a court justifiably finds an actual conflict of interest, there can be no doubt that it may decline [an affected defendant's] proffer of waiver, and insist that defendants be separately represented." *Id*. at 162. Moreover, said the Court, trial courts often must consider whether to accept a co-defendant's conflict waiver "not with the wisdom of hindsight after the trial has taken place, but in the murkier pre-trial context" where "[t]he likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict[.]" *Id*. As the Court explained:

> It is a rare attorney who will be fortunate enough to learn the entire truth from his own client, much less be fully apprised before trial of what each of the Government's witnesses will say on the stand. A few bits of unforeseen testimony or a single previously unknown or unnoticed document may significantly shift the relationship between multiple defendants. These imponderables are difficult enough for a lawyer to assess, and even more difficult to convey by way of explanation to a criminal defendant untutored in the niceties of legal ethics. Nor is it amiss to observe that the willingness of an attorney to obtain such waivers from his clients may bear an inverse relation to the care with which he conveys all the necessary information to them.

> *Id*. at 163.

For these reasons, held the Court, the trial court must be allowed "substantial latitude" in refusing waivers of conflicts of interest not only in instances of actual conflicts but also "in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses." *Id.* Although trial courts must "recognize a presumption in favor of petitioner's counsel of choice," said the Court, "that presumption may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict." *Id.* at 164. Further, whether that standard has been met under the facts and circumstances of a particular case "must be left primarily to the informed judgment of the trial court." *Id.* In exercising this judgment, the trial court should be alert to the possibility that the government may seek to "manufacture" a conflict in order to prevent a defendant from having a particular lawyer defend him. *Id.*

Turning to the facts before it, the Court agreed that the trial court had properly exercised its discretion in refusing Wheat's request to substitute Iredale. The Court observed that the trial court was "confronted not simply with an attorney who wished to represent two coequal defendants in a straightforward criminal prosecution; rather, Iredale proposed to represent three conspirators of varying stature in a complex drug distribution scheme." *Id.* at 163-64. Moreover, the government intended to call Bravo as a witness for the prosecution in Wheat's trial. *Id.* at 164. In addition, if Gomez–Barajas's plea agreement with the government was rejected, then "petitioner's probable testimony at the resulting trial of Gomez–Barajas would create an ethical dilemma for Iredale from which one or the other of his clients would likely suffer." *Id.* In the Court's view, "[i]n the circumstances of this case, with the motion for substitution of counsel made so close to the time of trial, the District Court relied on instinct and judgment based on

experience in making its decision," and did not exceed "the broad latitude which must be accorded it in making this decision." *Id*. at 163.

In its 2006 decision in *Gonzalez-Lopez*, 548 U.S. at 150, the Court clarified that the erroneous deprivation of the right to counsel of choice is a "structural error," and therefore not subject to a prejudice or harmless error analysis.

## II. Analysis

Saechao argues that the trial court abused its discretion and violated *Wheat* when it disqualified Kronenwetter shortly before trial was to begin. Picking apart each of the reasons cited by the court for its decision, Saechao argues that none of them suggested that a serious potential for conflict was likely to emerge. In fact, argues Saechao, the bulk of the court's comments show that its disqualification order was based on general concerns about *possible* conflicts that *might* arise from the period of dual representation, rather than on any probability that a genuine conflict would actually arise. Saechao insists that the ethical issues with which the trial court was concerned are present in every case of dual representation; under *Wheat*, they are not enough to overcome defendant's presumed right to keep his chosen attorney.

Moreover, argues Saechao, the court further violated *Wheat* by failing to consider whether the State had manufactured the conflict in order to get Kronenwetter disqualified.

Finally, contends Saechao, the Wisconsin Court of Appeals unreasonably applied *Wheat* by uncritically accepting the trial court's flawed analysis.

In support, Saechao cites *United States v. Turner*, 594 F.3d 946 (7th Cir. 2010). In *Turner*, the Seventh Circuit held that the district court had violated *Wheat* and had abused its discretion when it disqualified Turner's retained lawyer, who was already representing one of Turner's co-

conspirators (Womack) at sentencing and on appeal. The court noted at the outset that, "[b]ecause 'a possible conflict inheres in almost every instance of multiple representation,' the Supreme Court has said that only a *serious* potential conflict will justify overriding the defendant's choice of counsel[.]" *Id.* at 952 (emphasis in original) (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980), and citing *Wheat*, 486 U.S. at 164). The court then put its own gloss on what type of inquiry was necessary under *Wheat*:

> This requires an inquiry into the likelihood that the potential conflict will mature into an actual conflict and the degree to which it threatens the right to effective assistance of counsel. Accordingly, before disqualifying counsel based on a potential conflict, the district court should evaluate (1) the likelihood that the conflict will actually occur; (2) the severity of the threat to counsel's effectiveness; and (3) whether there are alternative measures available other than disqualification that would protect the defendant's right to effective counsel while respecting his choice of counsel. The first inquiry is the most important; a conflict that would seriously undermine counsel's effectiveness is not a basis for disqualification if it has little likelihood of occurring.

> *Id.* at 952.

Reviewing the record before it, the court in *Turner* found nothing to support a finding of a serious potential conflict sufficient to override Turner's right to hire counsel of his choice. The prosecutor never said the government intended to seek either defendant's cooperation or testimony against the other; the government already had other cooperating witnesses; and neither Womack nor Turner indicated an intent to help the government. To the contrary, Womach and Turner both agreed to waive their right to conflict-free representation. *Turner*, 594 F.3d at 953-54. At bottom, found the court,

> the judge disqualified [the lawyer] because one or the other of his clients *might* change his mind about cooperating with the government, but that possibility for conflict of interest inheres in almost every instance of multiple representation. The district court

essentially applied a rule that joint representation *necessarily* violates the defendant's right to effective counsel; this directly contradicts *Wheat*.

*Id.* at 954 (internal quotations and citations omitted).

In response to Saechao's reliance on *Turner*, the State notes correctly that circuit precedent does not constitute "clearly established Federal law" for purposes of § 2254(d), and that the sole question before this court is whether the Wisconsin courts reasonably applied *Wheat*. *See Parker v. Matthews*, 567 U.S. 37, 48–49 (2012) ("circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court,' [and] therefore cannot form the basis for habeas relief under AEDPA."). In fact, argues the State, "a test for determining the seriousness of a potential for conflict based on its likelihood of becoming an actual conflict would seem to run counter to *Wheat's* reasoning." Br. in Opp., dkt. 24, at 33. As the Court noted in *Wheat*, the difficulty of making such predictions in the pretrial context necessitated allowing trial courts "substantial latitude" when making this decision.

But the State recognizes that "substantial latitude" is not *carte blanche*. The court may veto a defendant's choice of counsel only upon a showing of a "serious potential for conflict" that threatens that lawyer's ability to provide effective assistance to his client. Determining a "serious potential" requires *some* sort of probability assessment by the trial court. Even under an abuse of discretion standard, a lower court can be reversed "if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence.'" *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 572 U.S. 559, 564 n. 2 (2014) (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990)). The bottom line is that no matter how broad the review standard, the trial court's decision is not immune from reversal if the court applied the wrong legal standard or based its decision on pure conjecture.

Toward this end, while the court's decision in *Turner* is not controlling precedent, it provides a helpful template for how this court should view the state court's reasons for disqualifying Kronenwetter from representing Saechao.

The State concedes that not all of the court's reasons were sound. The State concedes that Kronenwetter had only a *potential* conflict of interest as a result of his pre-trial representation of Saechao and Alonso–Bermudez; he did not have an *actual* conflict of interest as the trial court ultimately found. Addressing the six reasons outlined by the trial court and repeated in the Wisconsin Court of Appeals' decision, the State also concedes that the court was incorrect in finding that Kronenwetter could not continue to represent Saechao without breaching his duties of confidentiality to Saechao and Alonso-Bermudez (Reason #1). Br. in Opp., dkt. 24, at 35. The State does not dispute Saechao's contention that, although it was inadvisable for Kronenwetter to interview witnesses (Reason #5), this was irrelevant to determining whether a conflict would develop between Saechao and Alonso-Bermudez.

Nonetheless, continues the State, there were multiple reasons for the Wisconsin Court of Appeals' reasonably to conclude that the trial court did not abuse its discretion by disqualifying Kronenwetter. First, it argues, the court reasonably found that Saechao and Alonso-Bermudez– who then were both awaiting trial–could end up taking "significant potentially-adverse positions" at trial or in plea negotiations. (I presume this is Reason # 4 of the six cited by the Wisconsin Court of Appeals.) As Saechao points out, however, at the time the trial court made its disqualification decision, the parties already had staked out their positions, were preparing for trial, and were not engaged in any plea negotiations. Kronenwetter told the court just days before trial–and even on the date trial originally was set to begin–that, "absent the sky falling and everything taking a 180," Saechao's and Alonso-Bermudez's positions

were not materially adverse. Alonso-Bermudez's lawyer, who was present at one of those hearings, did not dispute that assertion, and the State does not contend that it ever contemplated asking either defendant to cooperate against the other.

It appears that most of the trial court's concerns about Kronenwetter's period of joint representation stemmed not from the particulars of the case, but from the presiding judge's inherent discomfort with joint representation in general. As the court admitted, it did not "understand how you can represent two co-defendants in the same case and not have a conflict." *Id*. at 22. Although the court was right to be concerned, it was wrong to suggest that a lawyer who represents codefendants with potentially conflicting interests is *de facto* ineffective. As the Seventh Circuit emphasized in *Turner*, "[o]ur legal system generally presumes that one attorney may effectively represent multiple codefendants." 594 F.3d at 954. *See also Cuyler*, 446 U.S. at 348 ("Since a possible conflict inheres in almost every instance of multiple representation, a defendant who objects to multiple representation must have the opportunity to show that potential conflicts impermissibly imperil his right to a fair trial . . . a reviewing court cannot presume that the possibility for conflict has resulted in ineffective assistance of counsel."); *Holloway v. Arkansas*, 435 U.S. 475, 482 (1978) ("Requiring or permitting a single attorney to represent codefendants, often referred to as joint representation, is not *per se* violative of constitutional guarantees of effective assistance of counsel. This principle recognizes that in some cases multiple defendants can appropriately be represented by one attorney[.]"). It is precisely because some defendants may *want* joint representation that the Court held in *Wheat* that a "serious potential for conflict" must be shown before a trial court can override a defendant's constitutionally-protected right to hire counsel of his choice.

Even so, the State argues, beyond its ingrained aversion to joint representation, the court had specific reason to be concerned that Kronenwetter's prior representation of Alonso-Bermudez would hamper his ability to make certain concessions at trial. Alluding to Reasons #3 and #6, the State argues that the trial strategy that Kronenwetter intended to pursue—that Xue Lee, not Saechao, was the driver—"could reasonably lead an unconflicted attorney to concede at trial that [Alonso-]Bermudez joined Rohmeyer in the conspiracy," a concession that the State claims Kronenwetter could not make without violating his duties to his former client Alonso-Bermudez. Br. in Opp., dkt. 24, at 37. But why couldn't Kronenwetter concede this fact? Alonso-Bermudez and Saechao were charged in separate complaints and were being tried separately before different juries. What harm would befall Alonso-Bermudez if Saechao's jury heard Saechao's counsel say that Alonso-Bermudez and Rohmeyer were part of the conspiracy but Saechao wasn't? The "concession" flagged by the State might have been problematic at a joint trial, but it vanishes upon severance. Moreover, to the extent the trial court was concerned about Alonso-Bermudez's name appearing in the jury instructions, that problem could have been solved by simply omitting his name and describing him generically as "another individual." *cf. United States v. Green*, 648 F.3d 569, 575 (7th Cir. 2011) (it is appropriate to substitute a generic reference for a defendant's name to avoid improper references to that defendant). For these reasons, Reasons # 3 and # 6 don't make sense.

Deviating from the six reasons outlined in the Wisconsin Court of Appeals' decision, the State argues that the trial court clearly did not believe Kronenwetter's statements about the nature of his prior representation of Alonso-Bermudez and the potential for conflicts, and reasonably concluded that during the time that Kronenwetter represented both Alonso-Bermudez and Saechao, Kronenwetter "discussed details of the case" with Alonso-Bermudez, "obtain[ed]

confidential information . . ., discuss[ed] trial strategy, [and] potentially obtain[ed] incriminating information on this case or others that could be used against [Alonso-Bermudez] . . . in Mr. Saechao's trial."  The State points to a number of conflicting statements made by Kronenwetter over the course of the multiple hearings that it says provided the court with "good reason to be skeptical" about Kronenwetter's statements on these matters.  *Id*. at 38.

Like much of the State's *apologia* of the state courts' decisions, this argument withers under consideration.  First, as Saechao points out, neither the trial court nor the Wisconsin Court of Appeals rested its decision on a finding that Kronenwetter was dishonest; in fact, the trial court described Kronenwetter as an "ethical attorney" and an "excellent defense attorney." Dkt. 15-16: 22.  Moreover, although successor counsel was appointed to represent and presumably advise Alonso-Bermudez about any potential conflicts, *he* did not seek Kronenwetter's disqualification, noting only that a problem could arise if Alonso-Bermudez was called as a witness.  Absent that occurring, however, any belief on the trial court's part that Kronenwetter had information that he would use "against" Alonso-Bermudez was pure speculation.

This segués cleanly to the last–and only potentially legitimate–reason for the court's disqualification decision: the fact that Alonso-Bermudez was named as a potential witness for the State (Reason # 2).  Saechao concedes this fact was relevant, but says it was not enough to warrant Kronenwetter's disqualification because there was no evidence that the State was *likely* to call Alonso-Bermudez.  Saechao points out that there is no evidence that Alonso-Bermudez ever was cooperating with the government or was willing to testify against Saechao and he ultimately was not called at Saechao's trial.  Moreover, at the time the court disqualified Kronenwetter, the State already had the assistance of two cooperating co-conspirators, Rohmeyer

and Schultz. All of this suggests that it was *un*likely that Alonso-Bermudez actually would testify.[8]

The court of appeals accepted uncritically the State's after-the-fact explanation that, "had Rohmeyer decided not to cooperate on the day of trial or had problems arisen during his testimony, Alonso–Bermudez's testimony would have been necessary because Alonso–Bermudez had information about Saechao's involvement known only to him, Saechao, and Rohmeyer." *State v. Saechao*, 2016 WI App 57 n. 11. This explanation raises two questions that the Wisconsin courts left unanswered.

First, how likely was it that Rohmeyer would refuse to cooperate? Recall that at the post-conviction hearing, Rohmeyer's lawyer reported that her client had made a full confession–including a full statement against Saechao–and had decided early on that testifying against Saechao and Alonso-Bermudez was his best defense. There is nothing in the record suggesting that Rohmeyer got cold feet as Saechao's trial date approached.

Moreover, had Alonso-Bermudez been called as witness, presumably he would have taken the Fifth. This leads to the second question: Was the State prepared to offer him immunity in exchange for his testimony if it decided to call him?

Neither the trial court nor the state appellate court addressed these questions. Without answers, the record reveals little more than a theoretical possibility that Alonso-Bermudez would testify. At the same time, however, it is apparent that the trial court genuinely believed that Alonso-Bermudez's addition to the witness list posed an *actual* threat of conflict, and the court

---

[8] As the State notes, the prosecutor said at the December 6 hearing that there was a "very likely possibility that at trial, one of the defendants would be called against the other." Dkt: 15-12: 5. At that time, however, Kronenwetter was representing both defendants and the preliminary hearing had yet to be completed. There is no evidence that it was still "very likely" that one of the defendants would be called against the other four months later, when Kronenwetter ultimately was disqualified.

was not alone: all of the lawyers present at the April hearings, including Kronenwetter, seemed to think that Alonso-Bermudez's inclusion on the State's witness list was a game-changer. Alonso-Bermudez's lawyer, Bachman, told the court that he "didn't see how Mr. Kronenwetter can go ahead" representing Saechao given the possibility that Alonso-Bermudez could testify, a proposition with which the prosecutor agreed. Even Kronenwetter seemed to think that his present and former clients' interests became adverse once Alonso-Bermudez had been named as a potential witness, although he still didn't see it as a problem warranting disqualification. No one suggested that the possibility that Alonso-Bermudez would testify was so remote as to be irrelevant to the conflict analysis. Under these circumstances, it is understandable that the court disqualified Kronenwetter, given its serious reservations about Kronenwetter's ability to effectively represent Saechao from the get-go.

Still, a judge can act for understandable reasons but still abuse his discretion. If this court were to review the state trial court's decision directly, then I probably would find that the trial court erred when it disqualified Kronenwetter, given how unlikely it was that Alonso-Bermudez actually would testify at Saechao's trial. But this is a §2254 petition, so the question is not what this court would have done; the question is whether it was unreasonable for the Wisconsin Court of Appeals to uphold the trial judge's disqualification decision. I see it as a close call, but I conclude that the answer is "no."

"The more general the [federal] rule, the more leeway [state] courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). *Wheat* speaks in very broad terms, granting trial courts "substantial latitude" to refuse a defendant's conflict waiver in cases where a serious potential for conflict has been shown, leaving that determination "primarily to the informed judgment of the trial court" to determine when

that standard is met. 486 U.S. at 163-64. The Court further licensed trial courts to rely on their "instinct and judgment based on experience" in making this determination, noting that "[t]he likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict[.]" *Id*. at 163. The Court also suggested that this prediction could account for contingencies. *Id*. at 164 ("If [Gomez-Barajas's plea] agreement were rejected, petitioner's probable testimony at the resulting trial of Gomez–Barajas would create an ethical dilemma for Iredale from which one or the other of his clients would likely suffer.").

Here the state trial court's instincts, honed by 20 years as a public defender, sensed trouble in Kronenwetter's joint representation. Still, the court approached the conflict issue deliberately, declining to disqualify Kronenwetter at the outset in spite of the court's discomfort, indicating that it would "let it play out" until closer to trial. During multiple pretrial hearings, the court sought information from Kronenwetter and the State, and asked for case law on the issue. The court did not disqualify Kronenwetter until it had a concrete example of how a conflict might arise: Alonso-Bermudez had been named as a potential witness for the State, a development that all parties seemed to agree increased the potential for conflict. The court explained that it had "looked at this from many different perspectives in a way to see if there was a possible way of Mr. Kronenwetter to continue on this case," tacitly recognizing the presumption in favor of Saechao's right to counsel of his choice.

Given *Wheat*'s broad parameters, coupled with the benefit of the doubt to which state court decisions are entitled, I am left resorting to a litotes: I cannot conclude that it was unreasonable in this case for the Wisconsin Court of Appeals to defer to the judgment of the trial court and affirm its decision to disqualify Kronenwetter. At the very least, there would seem to

be room for fairminded disagreement on this question, which dooms Saechao's bid for habeas relief.

Finally, Saechao is entitled to consideration of his argument that the state appellate court unreasonably applied *Wheat* because Judge Moran did not explicitly address the question whether the prosecutor was attempting to engineer Kronenwetter's disqualification. In *Wheat*, the Court acknowledged the possibility that the government might engage in this tactic in order to disqualify a particularly able defense counsel, but the Court noted that this was just one of the circumstances the trial court must consider in deciding whether to accept a defendant's conflict waiver. 486 U.S. at 164. Here, as the State points out, the trial court certainly was aware of the possibility because Kronenwetter repeatedly objected to the prosecutor's input regarding the conflict issue, to which the court responded that it was raising the conflict issue because of its own concerns, not the prosecutor's. Dkt. 15-12: 6 ("[The prosecutors] are not participating in choice of counsel. This is the court."). Moreover, after naming Alonso-Bermudez as a potential witness, the prosecutor initially took the position that Kronenwetter did *not* have to be disqualified, so long as the court conducted a colloquy with Alonso-Bermudez and Saechao. It was only later that the State came to believe (erroneously) that no valid waivers could be obtained and therefore Kronenwetter had an actual conflict. Finally, at the postconviction motion hearing, the trial court rejected Saechao's contention that the State instigated Kronenwetter's removal, explaining that "the record is clear that every court that presided over this case was concerned about the potential for conflict" and that he was prepared to address the issue "regardless of whose motion it was." *Saechao*, 2016 WI App at ¶ 26.

To be sure, there are facts that arguably support a contrary inference, and Saechao does his best to craft a tale of prosecutorial malfeasance, but there is more than one reasonable way

to interpret these facts.  On this record, I am satisfied that the state court of appeals reasonably determined that the trial court considered – and properly rejected – the possibility that the prosecutors manufactured the conflict.

## III. Conclusion

Federal habeas relief is rare, reserved for "those relatively uncommon cases in which state courts veer well outside the channels of reasonable decision–making about federal constitutional claims." *Dassey v. Dittmann*, 877 F.3d 297, 302 (7th Cir. 2017) (en banc).   As the analysis above suggests, more scrutiny of the trial court's reasons by the Wisconsin Court of Appeals would have revealed several of those reasons to be irrelevant or too speculative.  Still, I cannot say that the Wisconsin Court of Appeals "veered well outside the channels of reasonable decision-making" when it found that the trial court properly exercised its discretion under *Wheat*. Accordingly, Saechao's petition must be denied.  Because jurists of reason could disagree with this conclusion, Saechao is entitled to a certificate of appealability so that he may present his claim to the court of appeals.

ORDER

Ademus Akadeameuer Saechao's petition for a writ of habeas corpus is DENIED. He is granted a certificate of appealability on his claim that he is in custody in violation of his Sixth Amendment right to counsel of his choice.

Entered this 24th day of February, 2020.

BY THE COURT:

/s/
_____
STEPHEN L. CROCKER
Magistrate Judge